# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

JOSE CALDERON-FUENTES,

        Movant,

vs.                              Case No.:   3:20-cv-1397-BJD-JBT
                                                          3:17-cr-129-BJD-JBT

UNITED STATES OF AMERICA,

        Respondent.

_____/

## **ORDER**

Jose Calderon-Fuentes ("Calderon"), through counsel, moves under 28 U.S.C. § 2255 to vacate his conviction and sentence. (Civ. Doc. 1, § 2255 Motion.)[1] After a four-day trial, a jury convicted him of one count of theft of government property exceeding $1,000.00 in value and acquitted him of another charge. Calderon now challenges his conviction and sentence based on the ineffective assistance of trial counsel. The United States responded in opposition (Civ. Doc. 11, Response) and Calderon replied (Civ. Doc. 12, Reply). Thus, the case is ripe for a decision.

Under 28 U.S.C. § 2255 and Rule 8(a) of the Rules Governing Section 2255 Proceedings, the Court has considered the need for an evidentiary hearing and

---

[1]      "Civ. Doc. #" refers to entries on the civil § 2255 docket, No. 3:20-cv-1397-BJD-JBT. "Crim. Doc. #" refers to entries on the criminal docket, No. 3:17-cr-129-BJD-JBT.

determines that a hearing is unnecessary to resolve the merits.[2] No evidentiary hearing is required because the allegations are contradicted by the record, patently frivolous, or would not entitle Calderon to relief even if the facts he alleges are true. <u>Rosin v. United States</u>, 786 F.3d 873, 877 (11th Cir. 2015); <u>see also</u> <u>Patel v. United States</u>, 252 F. App'x 970, 975 (11th Cir. 2007).[3]

## I.    Facts

Calderon served in the United States Navy from 1974 to 1995. Following his retirement from the Navy, he requested disability benefits from the Department of Veterans Affairs ("VA"). (Crim. Doc. 157, Trial Transcript Vol. I at 130; Gov't Ex. 1A.) So, on May 7, 1996, the VA performed a "compensation and pension examination" ("C&P exam") to determine his eligibility for disability benefits. Trial Tr. Vol. I at 132–35; Gov't Ex. 1B.[4] The initial exam determined that Calderon did not qualify for vision-related benefits because his vision was 20/30 with correction. Gov't Ex. 1B at 1; Gov't Ex. 1C at 1.[5] Although

---

[2]    Rule 8(a) of the Rules Governing Section 2255 Proceedings requires the Court to review the record, including any transcripts and submitted materials, to determine whether an evidentiary hearing is warranted before resolving a § 2255 motion.

[3]    The Court does not rely on unpublished opinions as binding precedent, but they may be cited in this Order when the Court finds them persuasive on a particular point. <u>See</u> <u>McNamara v. GEICO</u>, 30 F.4th 1055, 1060–61 (11th Cir. 2022); <u>see</u> 11th Cir. R. 36–2.

[4]    Transcript citations refer to the page number stamped in the upper righthand corner, which may differ from the page number provided by CM/ECF.

[5]    20/20 is considered normal vision. (Crim. Doc. 150, Trial Transcript Vol. III at 87.) 20/30 vision means that a person would have to stand 20 feet away to see an object that someone with normal vision could see from 30 feet away. <u>See</u> <u>id.</u>

Calderon was diagnosed with bilateral granular corneal dystrophy, a condition that qualifies for VA benefits, the VA determined that his condition did not cause a compensable disability. Gov't Ex. 1C at 1; Trial Tr. Vol. I at 139.

In October 1996, Calderon asked the VA to reconsider its decision to deny him benefits. Gov't Ex. 1D. He said that an outside physician, Frank Bowden, M.D., had determined he was "pretty much blind" and that his vision was 20/70 in both eyes. Id. at 1–2; Trial Tr. Vol. I at 141–42. Based on the records he submitted, the VA found that Calderon was 30% disabled. Gov't Ex. 1E.

Over the next four years, Calderon submitted additional records to the VA, which resulted in gradual increases in his disability rating. He eventually reached a 100% disability rating based on "visual acuity no better than hand motion (light perception) in both eyes." Gov't Ex. 1I; see also Gov't Exs. 1F, 1H. The VA award letters advised Calderon that if he thought its decision was wrong, he "should write and tell us why." See Gov't Ex. 1H at 5; Gov't Ex. 1I at 6. Because of his 100% disability rating, Calderon received $2,100 more per month than he would receive with a 90% rating. Trial Tr. Vol. III at 99–101.

Eventually, the VA learned that while Calderon was submitting claims for increased disability benefits, he was maintaining a Florida commercial driver's license, which was valid from 1995 to 2001. Gov't Ex. 6J. And, on July 10, 2008, Calderon applied for and received a new Florida driver's license, which was valid through 2011. Id. Records from the Florida Department of Highway

3

Safety and Motor Vehicles ("DHSMV") showed that his vision was 20/70 in both eyes on that date. Gov't Ex. 6H at 4; Trial Tr. Vol. II (Crim. Doc. 149) at 227, 229–31. Yet during an eye exam at the VA the next day—July 11, 2008—Calderon claimed he could only count fingers from one foot away. Def. Ex. 5 (Crim. Doc. 109-3), Bates pp. 731–33; Trial Tr. Vol. IV (Crim. Doc. 151) at 26–27. Because of the discrepancies between his claims to the VA and his DHSMV records, the VA launched an investigation.

In May 2011, VA investigators observed Calderon on a walk with his wife, pushing a stroller. Trial Tr. Vol. I at 160–61; Gov't Ex. 1J (video recording of walk). Calderon had a walking stick laying across his shoulders, but he was not using it to assist him, even though he was walking next to a roadway. Trial Tr. Vol. I at 164. Calderon spoke to an agent during the walk, gave him directions after looking (and evidently pointing) at a map, and shook the agent's hand as soon as the agent offered it. Id. at 166; see also Gov't Ex. 1J. Likewise, in August 2011 a VA agent observed Calderon using a leaf blower to clear grass clippings near the edge of his yard and walking in the street, without assistance from anyone else. Trial Tr. Vol. I at 173–75; Gov't Ex. 1L.

In June 2012, at the VA's request, an agent with Homeland Security Investigations (HSI) called Calderon and asked to meet him at his home. Trial Tr. Vol. I at 175–77. Because the VA had learned that Calderon had recently returned from mission work in Peru, the meeting took place under the guise of

gathering information about his foreign travels. Id. Since the real purpose was to assess his visual acuity, Calderon was not told that the meeting was related to the VA's investigation. Id. at 178–79. An HSI agent and a VA agent went to Calderon's home, and when the HSI agent introduced himself, Calderon inspected that agent's credentials to confirm his identity. Id. at 178. During the meeting, Calderon said he had gone on several trips to Honduras and Peru, where he helped build churches. Id. at 179–80. Calderon stated that his activities involved mixing cement, laying rebar, using a shovel, and whatever else was needed. Id. at 180. The agents requested contact information for another person who had attended these mission trips. Calderon picked up a Blackberry-type device and, while holding it 18 to 24 inches from his face, without glasses on, he looked up a contact and showed it to the agents. Id. at 181, 182. The VA agent noticed that the font on the Blackberry device "was standard size font." Id. at 181. During the meeting, Calderon also showed the agents a laminated card that said he was an ordained minister, which Calderon easily retrieved from his wallet. Id. at 181–82. Near the end of the meeting, Calderon said, "I was once blind, but God healed me and now I can see." Id. at 184. As proof, he pointed from five or six feet away to a pen tucked into one of the agent's shirt pockets. Id. Calderon mentioned that VA doctors had told him he could not see, but that they were wrong and he could see. Id. at 185.

In September 2012, a VA agent made a recorded phone call to Calderon. Trial Tr. Vol. III at 120–24; <u>see also</u> Gov't Ex. 1O. The agent pretended to be trying to schedule a vision exam to determine whether his level of benefits was correct. Gov't Ex. 1O at 2. During the recorded call, Calderon said, "[M]y level at the present time is just the light perception and just moving them in [sic] the large objects and the small objects…. That's in both eyes." <u>Id.</u> at 4. He also stated that his wife drove him and that he "better not be behind no wheel." <u>Id.</u> Yet the month after, Calderon paid to renew his automobile insurance policy, in which he named himself as a driver. Gov't Ex. 7A.

From October 19 to November 15, 2012, VA agents used a pole camera to observe the driveway and front of Calderon's house. Trial Tr. Vol. I at 186–90. The agents captured over thirty instances of Calderon driving a black pickup truck registered to him. <u>Id.</u> at 189; <u>see also</u> Gov't Ex. 1M (pole camera recordings); Gov't Ex. 6A (registration). During this same period, he had an eye examination at the VA. Gov't Ex. 1R at 1, 3–4. During the exam, his vision in both eyes was found to be "20/HM@1," meaning that Calderon claimed he could see only hand motion one foot from his face. <u>Id.</u> at 3; Trial Tr. Vol. II at 35. Even so, Calderon drove his truck without apparent difficulty, and longtime neighbors who saw him driving had no reason to believe he had a serious vision impairment. <u>See</u> Trial Tr. Vol. III at 46–52, 59–60, 62–68, 81.

In December 2012, a VA agent who had met before with Calderon returned to his home with another VA agent. Trial Tr. Vol. II at 36–37. When the agents arrived, Calderon was in the carport working on a boat motor without the aid of glasses. Id. at 39. The agents identified themselves as from the VA and asked Calderon if he could discuss his disability rating with them. Id. He agreed and invited them onto his porch. Id. At first, he said, "I'm not in the dark, but I am legally blind." Id. at 41. He said he could perceive some motion but could not see detail. Id. Calderon then said he could see some detail within one or two feet. Id. He said his vision was only getting worse over time. Id. at 62. The VA agents asked Calderon about his work, and he stated that he did volunteer work for his church, id. at 44, including traveling to Honduras to build churches, id. at 48. This time, Calderon said his role was "sift[ing] sand, because I'm unable to do much else…." Id.

When the agents asked Calderon if he could drive, he responded that he could not and that his wife drove him everywhere. Id. at 41. The agents confronted him with the fact that they had video of him driving, to which he responded that he drove only in emergencies and only short distances, which amounted to three or four times a month (although the pole camera captured 33 instances in a 28-day period). Id. at 53–54. He also admitted that he had driven to Naval Air Station Jacksonville, which is about seven miles from his house. Id. at 55, 61. When asked how he could drive on the freeway to the base,

he answered, "I don't drive on the freeway that fast." Id. at 56. When asked if he had a driver's license, Calderon said he had one, but he did not use it. Id. at 43. An agent asked how he passed the vision exam to obtain a driver's license in 2008, and Calderon at first said he had memorized the chart. Id. When reminded the exam was conducted by machine instead of by chart, he stated he had memorized what the person in front of him said. Id. at 43–44. Eventually, Calderon admitted that when he got his driver's license in 2008, he knew his VA disability benefits were greater than they should have been. Id. at 62–63.

Calderon sought the services of an attorney following this interview. On December 14, 2012, he completed a "New Client Information Form" for the Law Office of Mark Rosenblum, P.A. (Civ. Doc. 1-1, Petitioner's Exhibit [Pet. Ex.] 1.)

In April 2013, the VA performed a C&P exam to reconsider the amount of benefits Calderon was receiving. Calderon states that his attorney, Mr. Rosenblum, and Mr. Rosenblum's associate, Vanessa Newtson, knew he was under investigation by the VA and the United States Attorney's Office, but neither attorney advised him against attending the exam or told him his statements could be used against him in a criminal investigation. § 2255 Motion at 11. During this exam, Calderon claimed he could not read the top line of the vision chart—a large letter "E"—which would mean his vision was worse than 20/400. Trial Tr. Vol. II at 71–72, 150; see also Gov't Ex. 3A (video recording of C&P exam); Gov't Ex. 3B at 11–12 (exam transcript). When asked if he drove,

8

he answered, "I don't. I shouldn't be driving at all," but added "my wife got sick one time and I have to get behind the wheel." Gov't Ex. 3B at 14–15.

Just two months after the above VA exam, Calderon obtained a driver's license in Puerto Rico. Gov't Ex. 9A; Trial Tr. Vol. III at 153–54, 156. To obtain a driver's license in Puerto Rico, the territory requires an applicant to obtain a medical certification from a private doctor. Trial Tr. Vol. III at 149–50. According to documents he submitted to Puerto Rico's authorities, Calderon's vision was 20/50 during an examination on June 11, 2013. Gov't Ex. 9A at 2; Trial Tr. Vol. III at 157. About a month after receiving the driver's license in Puerto Rico, Calderon had another eye exam at the VA. Def. Ex. 5 at Bates p. 699; Trial Tr. Vol. IV at 28. Yet, during this exam, he performed in a way that his vision was no better than 1/700, or 20/14,000. Def. Ex. 5 at Bates p. 701; Trial Tr. Vol. IV at 28–29.

On September 10, 2013, the VA informed Calderon it was reducing his disability rating from 100% to 30%, resulting in a $3,500 monthly reduction in benefits. Gov't Ex. 1T at 1. In response, he returned to see his private ophthalmologist, Dr. Bowden. See Trial Tr. Vol. II at 116–17. Based partly on subjective testing, Dr. Bowden determined that Calderon could "count fingers at one foot." Id. at 123–24. Using Dr. Bowden's report, Calderon requested that the VA restore his 100% disability rating. Gov't Ex. 2B.

While treating Calderon, Dr. Bowden recommended that he undergo a type of laser eye surgery called "PTK,"[6] but Calderon never did so, explaining that he was trying to get the VA to pay for the surgery. Trial Tr. Vol. II at 126. But there was no record of Calderon requesting that the VA pay for a PTK procedure. Trial Tr. Vol. III at 126–27. Calderon also told Dr. Bowden that he could not drive because of his eyesight. Trial Tr. Vol. II at 121; Gov't Ex. 2A at 1. Dr. Bowden's records contained no indication that Calderon mentioned he had obtained a driver's license in Puerto Rico just a few months earlier and had 20/50 vision. See Gov't Ex. 2A.

According to Calderon, his attorneys (Mr. Rosenblum and Ms. Newtson) met with an Assistant U.S. Attorney on June 3, 2014, and the next day the government offered for Calderon to plead guilty to a felony information. § 2255 Motion at 6, 7. The offer was open until June 30, 2014. Id. at 7. However, Calderon's attorneys never communicated the offer to him. Id. On July 1, 2014, Calderon signed a representation agreement with Mr. Rosenblum's office, in which Calderon agreed to pay a $30,000.00 retainer. (Civ. Doc. 1-2, Pet. Ex. 2.) Calderon paid $15,000.00 up front and agreed to pay the remainder in $1,000.00 monthly installments. Id.

---

[6]     "PTK" stands for phototherapeutic keratectomy.

10

Two years later, in December 2016, the government tentatively offered Calderon the opportunity to participate in a pretrial diversion program. § 2255 Motion at 6. Under pretrial diversion, Calderon could avoid criminal charges by admitting making a false statement, being remorseful, and successfully completing up to 18 months of pretrial diversion. (See Civ. Doc. 1-5, Pet. Ex. 5; Civ. Doc. 1-6, Pet. Ex. 6.) Calderon's attorneys notified him of the pretrial diversion offer but Calderon rejected it. See § 2255 Motion at 6–7, 16–17. Then, on June 26, 2017, Mr. Rosenblum conveyed to Calderon a government offer to plead guilty to one count of making a false statement. Id. at 9. Mr. Rosenblum, who had since joined the Federal Public Defender's Office, also notified Calderon that the Federal Public Defender's Office would take over the case (with Mr. Rosenblum remaining as counsel). See id. Calderon rejected this plea offer as well. Id.

On July 13, 2017, a federal grand jury returned a two-count indictment against Calderon, charging him with one count of theft of government property exceeding $1,000.00 in value, in violation of 18 U.S.C. § 641 (Count One), and one count of making a false statement during the VA investigation, in violation of 18 U.S.C. § 1001 (Count Two). (Crim. Doc. 1, Indictment.) Calderon, assisted by Mr. Rosenblum, pleaded not guilty. Through counsel, he moved to dismiss Count One to the extent it involved conduct that fell outside the statute of limitations period, i.e., before July 13, 2012. (Crim. Doc. 26, Motion to Dismiss

11

Indictment.) The Court partially granted the Motion and dismissed Count One to the extent it charged Calderon with a crime for conduct that occurred before July 13, 2012. (Crim. Doc. 43, Order on Motion to Dismiss Indictment.) Calderon also moved to suppress evidence and statements gathered as a result of warrantless "knock and talk" procedures used by VA and HIS agents on June 13, 2012, and December 10, 2012. (Crim. Doc. 27, Motion to Suppress.) The Court denied that motion following an evidentiary hearing at which Calderon testified. (See Crim. Doc. 71, Order Denying Motion to Suppress.) The Court later found that Calderon's testimony at the suppression hearing—where he accused federal agents of various misdeeds—was false and was an attempt to obstruct the proceedings. (Crim. Doc. 119, Presentence Investigation Report ["PSR"] ¶ 37; Crim. Doc. 142, Sentencing Transcript at 24–26.)

The case went to a four-day jury trial in June 2018. The government argued that for years, Calderon falsely claimed to be disabled because of blindness in both eyes so he could illegally obtain increased VA benefits, and that he lied to a VA agent about the severity of his visual impairments. The jury heard from over twenty witnesses, including Charles Arbogast (the lead VA agent who investigated Calderon), Dr. Bowden, Dr. Wong (the VA optometrist), and Calderon's neighbors. In the end, the jury convicted Calderon of Count One of the Indictment and acquitted him of Count Two. (Crim. Doc. 111, Jury Verdict.)

The Court sentenced Calderon to a term of five years' probation, including one year of home confinement, and ordered him to pay restitution to the VA in the amount of $43,881.00. (Crim. Doc. 128, Judgment.) The Court also entered an order of forfeiture for $43,881.00. (Crim. Doc. 130, Order of Forfeiture.)

Calderon appealed his conviction and sentence, arguing that

> (1) the district judge should have reheard the testimony regarding his motion to suppress anew; (2) the district court erred in denying his motion to suppress because his consent was coerced and unwilling; (3) the district court denied him the right to present a complete defense by excluding as demonstrative evidence low vision simulators that were relevant, not prejudicial, and would have aided the jury in understanding the physical principles involved in having low vision; and (4) the evidence was insufficient to sustain the jury's verdict.

United States v. Calderon-Fuentes, 788 F. App'x 630, 632 (11th Cir. 2019). The Eleventh Circuit rejected each argument and affirmed Calderon's conviction and sentence. Id. at 632–37. He did not seek certiorari review from the Supreme Court. These § 2255 proceedings timely followed.

## II.   Governing Law

Under Title 28, United States Code, Section 2255, a person in federal custody may move to vacate, set aside, or correct his sentence. Section 2255 permits collateral relief on four grounds: (1) the sentence was imposed in violation of the Constitution or laws of the United States; (2) the court lacked jurisdiction to impose the sentence; (3) the imposed sentence exceeded the maximum authorized by law; or (4) the imposed sentence is otherwise subject to collateral attack. 28 U.S.C § 2255(a) (2008). Only jurisdictional claims,

constitutional claims, and claims of error that are so fundamentally defective as to cause a complete miscarriage of justice warrant relief through collateral attack. United States v. Addonizio, 442 U.S. 178, 184–86 (1979); Spencer v. United States, 773 F.3d 1132, 1138 (11th Cir. 2014) (en banc) ("[A] district court lacks the authority to review the alleged error unless the claimed error constitute[s] a fundamental defect which inherently results in a complete miscarriage of justice." (internal quotation marks omitted)). A petitioner's claim that he received ineffective assistance of counsel in violation of the Sixth Amendment is properly brought in a collateral proceeding under § 2255. Massaro v. United States, 538 U.S. 500, 504 (2003).

To establish ineffective assistance of counsel, a § 2255 movant must establish both: (1) that his counsel's conduct amounted to constitutionally deficient performance, and (2) that counsel's deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 687, 694 (1984). In determining whether counsel performed deficiently, the Court adheres to the standard of reasonably effective assistance. Weeks v. Jones, 26 F.3d 1030, 1036 (11th Cir. 1994) (citing Strickland, 466 U.S. at 688). The petitioner must show, given all the circumstances, that counsel's performance fell outside the "wide range of professionally competent assistance." Scott v. United States, 890 F.3d 1239, 1258 (11th Cir. 2018) (internal quotation marks and citation omitted). In other words, "[t]he standard for effective assistance of counsel is

14

reasonableness, not perfection." Brewster v. Hetzel, 913 F.3d 1042, 1056 (11th Cir. 2019) (citing Strickland, 466 U.S. at 687). To show that counsel's deficient performance prejudiced the defense, the petitioner must show a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. Strickland, 466 U.S. at 694. In determining whether a petitioner has met the two prongs of deficient performance and prejudice, the Court considers the totality of the evidence. Id. at 695. Because both prongs are necessary, "there is no reason for a court… to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." Id. at 697.

A § 2255 movant "bears the burden to prove the claims in his § 2255 motion." Rivers v. United States, 777 F.3d 1306, 1316 (11th Cir. 2015); see also Beeman v. United States, 871 F.3d 1215, 1221–23 (11th Cir. 2017). If "'the evidence does not clearly explain what happened … the party with the burden loses.'" Beeman, 871 F.3d at 1225 (citation omitted). A § 2255 movant is not entitled to a hearing, much less relief, "when his claims are merely conclusory allegations unsupported by specifics or contentions that in the face of the record are wholly incredible." Tejada v. Dugger, 941 F.2d 1551, 1559 (11th Cir. 1991) (citation omitted).

### III.   Discussion

Calderon raises four grounds for relief in his § 2255 Motion, all alleging he was deprived of his Sixth Amendment right to the effective assistance of counsel. First, he claims that his attorneys failed to properly advise him of the government's pretrial diversion offer in December 2016. § 2255 Motion at 6–7, 16–23. Calderon acknowledges that his attorneys informed him of the offer, id. at 6, and that they "advised [him] that the pretrial diversion offer was a good offer," id. at 17. However, he alleges that counsel failed to spell out for him that the pretrial diversion offer would allow him to avoid a conviction and criminal charges. Id. at 6. Calderon asserts that he rejected the pretrial diversion offer because he thought it would result in a felony conviction. Id. He contends that if his attorneys had advised him that pretrial diversion would allow him to avoid a conviction, he would have accepted the offer. Id. at 7.

Second, Calderon alleges that his attorneys operated under a conflict of interest because their personal financial interests were inconsistent with his own. Id. at 7–10, 23–26. In essence, he argues that his attorneys' interest in getting paid caused them not to properly advise him about two pre-indictment offers to resolve the case. He alleges that his attorneys did not convey to him the government's June 2014 plea offer, which expired just before Calderon signed the $30,000 retainer agreement, because he would not have signed the retainer agreement had he accepted that offer. Id. at 10, ¶ 18; id. at 23–24. But

Calderon does not allege that he would have accepted this offer had it been relayed to him; indeed, he later rejected a pretrial diversion offer in 2016 and another plea offer in June 2017. He also alleges that his attorneys failed to fully advise him about the 2016 pretrial diversion offer—or failed to start negotiating a pretrial diversion offer earlier—because Calderon's acceptance of that offer would have required counsel to refund the unearned portion of the retainer. Id. at 10, ¶ 18; id. at 24–26.[7] But Calderon admits that, despite his attorneys' alleged inconsistent financial interests, they "advised [him] that the pretrial diversion offer was a good offer." Id. at 17.

Third, Calderon alleges that his attorneys failed to inform him that any information the VA gained from the April 2013 C&P exam could be used against him in a criminal investigation. Id. at 11–13, 26–28. He argues—questionably it seems—that because "C&P exams are not required once a veteran obtains 100% disability … it was clear this exam was another ruse by the Government to collect evidence of a crime." Id. at 27.[8] Thus, Calderon argues that counsel

---

[7]     Some portion of the retainer must have been refundable, Calderon says, because under Rule 4-1.5(e)(1) of the Rules Regulating the Florida Bar, for a retainer to be non-refundable it must be in writing. Since the retainer agreement said nothing about non-refundability, Calderon says that "any unearned portion would need to be refunded." § 2255 Motion at 24.

[8]     In fact, no veteran is entitled to continue receiving benefits indefinitely if "the original grant [of benefits] was based on fraud…." 38 C.F.R. § 3.957. The VA will request a reexamination "whenever VA determines there is a need to verify either the continued existence or the current severity of disability." Id., § 3.327. "Generally, reexaminations will be required … if evidence indicates … that the current rating may be incorrect." Id. "Individuals for whom reexaminations have been authorized and scheduled are required to report for such examinations." Id. (emphasis added). If a recipient fails to report, his or her benefits may be

should have known that the April 2013 C&P exam was related solely to a criminal investigation and advised Calderon against attending it. He points out that counsel later advised Calderon against attending a 2014 VA exam with a different doctor because "it had the potential to create more evidence for the Government." Id. at 27 (citing Pet. Ex. 9). He argues that "[t]his was clearly reasonable advice that should have been given to Calderon-Fuentes at the initial C&P exam." Id.

Fourth, Calderon alleges that his lead attorney, Mr. Rosenblum, was ineffective at trial because he failed to ask certain follow-up questions of Dr. Bowden on cross-examination. Id. at 13–15, 29–31. He also alleges that Mr. Rosenblum was ineffective because he failed to follow up with Dr. Wong about the results of a so-called optokinetic nystagmus ("OKN") drum test. Id. Finally, Calderon argues that the cumulative effect of his attorneys' errors prejudiced him. Id. at 31–32.

The government argues that Grounds One through Three fail as a matter of law because the Sixth Amendment right to counsel had not attached when the alleged deficiencies occurred. Response at 11–15. The government also argues that each ground fails on the merits. Id. at 15–25.

---

reduced or "discontinued" entirely. Id., § 3.655(a), (c). As a result, it would not have been clear to Calderon or his attorneys that the VA's April 2013 C&P exam was nothing but a ruse to gain information for a criminal investigation.

## A. The right to the assistance of counsel had not attached at the times relevant to Grounds One, Two, and Three

As discussed above, in Grounds One through Three, Calderon accuses his attorneys of various failings that manifested themselves between December 2012 (when Calderon first engaged counsel) and December 2016 (when counsel allegedly failed to fully explain the government's pretrial diversion offer). All these things occurred while Calderon was under investigation by the VA, but months or years before Calderon was indicted. Because the Sixth Amendment right to counsel had not attached at the relevant times, these grounds are not a basis for relief from his conviction and sentence under 28 U.S.C. § 2255.

The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right … to have the Assistance of Counsel for his defence." U.S. Const., amend. VI. The key phrase here is "[i]n all criminal prosecutions." The Supreme Court has said repeatedly that the Sixth Amendment right to counsel "does not attach until a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." McNeil v. Wisconsin, 501 U.S. 171, 175 (1991) (internal quotation marks omitted) (quoting United States v. Gouveia, 467 U.S. 180, 188 (1984)); see also Moran v. Burbine, 475 U.S. 412, 428–32 (1986) (holding that Sixth Amendment right to counsel did not attach

to pre-indictment interrogation, even though suspect had retained counsel); Maine v. Moulton, 474 U.S. 159, 176–80 (1985) (defendant's uncounseled statements, which were obtained by an informant, were inadmissible as to offenses for which defendant had been indicted but remained admissible as to offenses for which he had not yet been indicted); Kirby v. Illinois, 406 U.S. 682, 689 (1972) (plurality opinion) (concluding that Sixth Amendment right to counsel did not attach to a post-arrest, pre-indictment lineup identification procedure). "[A] criminal defendant's initial appearance before a judicial officer, where he learns the charge against him and his liberty is subject to restriction, marks the start of adversary judicial proceedings that trigger attachment of the Sixth Amendment right to counsel." Rothgery v. Gillespie Cnty., Tex., 554 U.S. 191, 213 (2008).

The "conclusion that the right to counsel attaches at the initiation of adversary judicial criminal proceedings 'is far from a mere formalism.'" Gouveia, 467 U.S. at 189 (quoting Kirby, 406 U.S. at 689). As the Supreme Court explains,

> It is only at that time "that the government has committed itself to prosecute, and only then that the adverse positions of government and defendant have solidified. It is then that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law."

Id. (quoting Kirby, 406 U.S. at 689).

At the time of the attorneys' errors alleged in Grounds One through Three, none of the events that marks the beginning of "adversary judicial criminal proceedings" had occurred yet. During the four-plus years before the Indictment, Calderon alleges that his attorneys failed to properly explain the government's December 2016 pretrial diversion offer; developed a financial conflict of interest, which caused them not to convey the government's June 2014 plea offer and not to properly explain the 2016 pretrial diversion offer; and failed to advise him against the hazards of attending the VA's April 2013 C&P exam. He claims these errors deprived him of his Sixth Amendment right to the effective assistance of counsel. § 2255 Motion at 6–13. But before July 13, 2017 (the date the grand jury returned the indictment), Calderon had not been formally charged with any crime, whether by indictment, information, or criminal complaint. He had not been arraigned. And he had not appeared before a judicial officer for any preliminary criminal hearing. Nor, for that matter, had he been detained or subject to an arrest warrant. Although Calderon was under investigation by the VA, federal authorities were still gathering evidence and the government had not yet formally charged him with any offenses. Thus, the Sixth Amendment right to counsel had not attached. Because the Sixth Amendment's guarantee of the right to counsel had not attached at the relevant times, Grounds One through Three do not state a violation of the Sixth Amendment right to counsel.

Although Calderon retained criminal defense counsel years before he was indicted, while the VA's investigation was ongoing, that fact does not cause the Sixth Amendment right to counsel to attach any earlier. As the Supreme Court said in <u>Moran</u>,

> [T]he suggestion that the existence of an attorney-client relationship itself triggers the protections of the Sixth Amendment misconceives the underlying purposes of the right to counsel. The Sixth Amendment's intended function is not to wrap a protective cloak around the attorney-client relationship for its own sake any more than it is to protect a suspect from the consequences of his own candor. Its purpose, rather, is to assure that in any "criminal prosecutio[n]," U.S. Const., Amdt. 6, the accused shall not be left to his own devices in facing the "'prosecutorial forces of organized society.'" <u>Maine v. Moulton</u>, <u>supra</u>, 474 U.S., at 170, 106 S. Ct., at 484 (quoting <u>Kirby v. Illinois</u>, <u>supra</u>, 406 U.S., at 689, 92 S. Ct., at 1882). By its very terms, it becomes applicable only when the government's role shifts from investigation to accusation. For it is only then that the assistance of one versed in the "intricacies ... of law," <u>ibid.</u>, is needed to assure that the prosecution's case encounters "the crucible of meaningful adversarial testing." <u>United States v. Cronic</u>, 466 U.S. 648, 656, 104 S. Ct. 2039, 2045, 80 L. Ed. 2d 657 (1984).

<u>Moran</u>, 475 U.S. at 430.

Calderon admits that "the Supreme Court has never found [that] a Sixth Amendment right to counsel applies to pre-indictment proceedings." Reply at 1. At any rate, he argues that a Sixth Amendment right to counsel should attach at least to pre-indictment plea negotiations. He puts forth several reasons for doing so, including that: (1) "[p]lea negotiations are the most important stage in criminal proceedings, frequently being the only stage"; (2) unrepresented defendants are at a disadvantage when engaging in plea negotiations with an experienced prosecutor; and (3) pre-charge plea bargaining requires intricate

knowledge of the law and the legal consequences of a conviction (such as potential immigration consequences and sentencing exposure). Id. at 2. He argues that "[t]he same logical underpinnings of Frye[9] and Lafler[10] are applicable in pre-indictment plea negotiations; thus, the right to counsel should attach." Id. at 3.

This argument "makes the fundamental 'mistake' of confusing the 'critical stage question' with the 'attachment question.'" Turner v. United States, 885 F.3d 949, 953 (6th Cir. 2018) (en banc) (quoting Rothgery, 554 U.S. at 211). The Supreme Court stresses that these questions are distinct. Rothgery, 554 U.S. at 211–12. It is true that, for many of the reasons Calderon puts forth, the Supreme Court held in Frye, 566 U.S. 134, and Lafler, 566 U.S. 156, that plea negotiations are a critical stage of the proceedings for Sixth Amendment purposes. The Supreme Court extended the right to the effective assistance of counsel to plea bargaining because it recognized that plea negotiations have become "central to the administration of the criminal justice system" and frequently determine "who goes to jail and for how long," often making plea negotiations "the only stage when legal aid and advice would help" criminal defendants. Frye, 566 U.S. at 143–44; see also Lafler, 566 U.S. at 169–70 (observing "the reality that criminal justice today is for the most part a system

---

9       Missouri v. Frye, 566 U.S. 134 (2012).

10      Lafler v. Cooper, 566 U.S. 156 (2012).

of pleas, not a system of trials."). But in <u>Frye</u> and <u>Lafler</u>, the plea negotiations occurred <u>after</u> the defendants had been formally charged. <u>Frye</u>, 566 U.S. at 138; <u>Lafler</u>, 566 U.S. at 161. Neither case dealt with when the Sixth Amendment right to counsel <u>attaches</u>.

<u>Frye</u> and <u>Lafler</u> establish that post-indictment plea negotiations are a "critical stage" of the proceedings, but it does not follow that the Sixth Amendment right to counsel attaches to pre-indictment plea negotiations. Indeed, a procedure that counts as a "critical stage" of the proceedings if it occurs after indictment may be one where no Sixth Amendment right to counsel attaches if it occurs before indictment. Take interrogations and pretrial lineups for example. When they occur after adversarial judicial criminal proceedings have begun, they are critical stages of the proceedings at which a defendant has a Sixth Amendment right to the assistance of counsel. <u>Massiah v. United States</u>, 377 U.S. 201, 204–06 (1964) (post-indictment interrogation); <u>United States v. Wade</u>, 388 U.S. 218, 236–37 (1966) (post-indictment lineup). The Supreme Court recognizes interrogations and lineups as critical stages of the proceedings because these are "stages in the criminal justice process 'where the results might well settle the accused's fate and reduce the trial itself to a mere formality,'" and where "depriv[ing] a person of counsel … may be more damaging than denial of counsel during the trial itself." <u>Moulton</u>, 474 U.S. at 170 (quoting <u>Wade</u>, 388 U.S. at 224). Yet the same procedures do not implicate

the Sixth Amendment right to counsel when they occur before adversarial judicial criminal proceedings have begun. <u>Moran</u>, 475 U.S. at 428–32 (Sixth Amendment right to counsel did not attach to pre-indictment interrogation); <u>Kirby</u>, 406 U.S. at 689 (Sixth Amendment right to counsel did not attach to pre-indictment lineup). Likewise, that <u>post-indictment</u> plea negotiations qualify as a critical stage of the proceedings does not mean that the Sixth Amendment right to counsel attaches to <u>pre-indictment</u> plea negotiations. <u>See</u>, <u>e.g.</u>, <u>Turner</u>, 885 F.3d at 953 (reaffirming the court's "long-standing rule that the Sixth Amendment right to counsel does not extend to preindictment plea negotiations" because "[t]he Supreme Court's attachment rule is crystal clear" that "a person's Sixth Amendment right to counsel 'attaches only at or after the time that adversary judicial proceedings have been initiated against him.'" (quoting <u>Gouveia</u>, 467 U.S. at 187)); <u>United States v. Olson</u>, 988 F.3d 1158, 1162–63 (9th Cir. 2021) (same); <u>Kennedy v. United States</u>, 756 F.3d 492, 493–94 (6th Cir. 2014) (same); <u>see also</u> <u>United States v. Waldon</u>, 363 F.3d 1103, 1112 n.3 (11th Cir. 2004) (rejecting "out-of-hand" defendant's Sixth Amendment ineffective assistance claim relating to a subpoena to testify before a grand jury, before he was formally charged, "because the Sixth Amendment right to counsel simply does not attach until the initiation of formal adversary proceedings.").

Nothing about the Supreme Court's decisions in <u>Frye</u> and <u>Lafler</u> erased the distinction between pre-indictment proceedings and post-indictment proceedings for purposes of when the Sixth Amendment right to counsel attaches. As the Sixth Circuit observed,

> If anything, <u>Frye</u> and <u>Lafler</u> accept the rule that the right to counsel does not attach until the initiation of adversary judicial proceedings. Neither decision expressly abrogates or questions the rule…. [R]ecognizing that the Sixth Amendment guarantees a right to counsel at "all critical stages of [a] criminal proceeding[ ]," <u>Frye</u> explained that those critical stages include "arraignments, <u>postindictment</u> interrogations, <u>postindictment</u> lineups, and the entry of a guilty plea." <u>Frye</u>, 132 S. Ct. at 1405 (internal quotations omitted) (emphasis added). Had the Supreme Court erased the line between preindictment and postindictment proceedings for plea negotiations, it surely would have said so given its careful attention to the distinction for interrogations and lineups.

<u>Kennedy</u>, 756 F.3d at 493–94. Thus, <u>Frye</u> and <u>Lafler</u> do not support a conclusion that the Sixth Amendment right to counsel applies to pre-indictment plea discussions.

Calderon also argues that the Sixth Amendment right to counsel should attach to pre-indictment plea negotiations because plea negotiations mark a shift in the government's role from investigation to accusation—a point when a suspect begins to face organized prosecutorial forces. Reply at 2–3. This argument is tautological. But more important, pre-indictment plea negotiations are not necessarily any more accusatory than pre-indictment interrogations and lineups, and society's organized prosecutorial forces no less involved. Moreover, the Sixth Amendment right to counsel is "offense specific," applying only to

those offenses for which adversarial judicial proceedings have begun. <u>McNeil</u>, 501 U.S. at 175. Pre-indictment plea negotiations, if they occur, necessarily happen before a suspect has been formally charged with an offense and will often involve a back-and-forth between the suspect and prosecutor about what offense(s) the suspect will admit (if any). As a practical matter then, it is hard to see how the offense-specific Sixth Amendment right to counsel can apply to such negotiations when it has not yet been fixed what offense(s) the suspect will admit or be charged with.

Returning to first principles, the rule that the Sixth Amendment right to counsel attaches only once adversarial judicial proceedings have begun is not "a mere formalism." <u>Gouveia</u>, 467 U.S. at 189. It derives from the Sixth Amendment's text, which says that the right to have the assistance of counsel applies to the "accused" "[i]n all criminal prosecutions." U.S. Const., amend. VI. A "criminal prosecution" begins "by way of formal charge, preliminary hearing, indictment, information, or arraignment," or some similar "adversary judicial criminal proceeding." <u>McNeil</u>, 501 U.S. at 175. Only then has "the government committed itself to prosecute," "that the adverse positions of government and defendant have solidified," and "that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law." <u>Gouveia</u>, 467 U.S. at 189 (quoting <u>Kirby</u>, 406 U.S. at 689). Before the grand jury indicted Calderon, the

government had not committed itself to prosecuting him, and the adverse positions of Calderon and the government had not solidified. The fact that the government offered Calderon pretrial diversion in December 2016 proves as much. Under the pretrial diversion offer, the government would have held any charges in abeyance pending completion of pretrial diversion and, if Calderon successfully completed the program, the government would not have brought charges at all. See Pet. Ex. 6. That, by itself, shows that the government was not committed to prosecuting Calderon.

Although Calderon was dealing with a prosecutor during the pre-indictment negotiations, he was not "faced with the prosecutorial forces of organized society" to the same degree as a defendant facing formal charges. Gouveia, 467 U.S. at 189. Without an indictment or formal charge, the government remained free not to pursue any charges, as reflected by the pretrial diversion offer. Nor was Calderon "immersed in the intricacies of substantive and procedural criminal law" to the same extent as a defendant facing formal charges (at least, no more so than the defendants involved in pre-indictment lineups and interrogations in Kirby and Moran). For example, the Federal Rules of Criminal Procedure apply only in "criminal proceedings in the United States district courts, the United States courts of appeals, and the Supreme Court of the United States." Fed. R. Crim. P. 1(a)(1). Before Calderon was indicted, he was not involved in any proceedings in the United States

courts: he had not been arrested or subject to an arrest warrant, he had not been arraigned, nor had he been required to appear before any federal judicial officer. As far as Calderon was concerned, he was not immersed in the intricacies of federal criminal procedure. Thus, before Calderon's indictment, the core concerns that trigger the Sixth Amendment right to counsel had not come into play. See Gouveia, 467 U.S. at 189.

Also worth a reminder is the "offense specific" nature of the Sixth Amendment right to counsel. McNeil, 501 U.S. at 175. Even if the pre-indictment plea negotiations between Calderon's attorneys and the prosecutor amounted to a formal accusation of a crime, the only offense discussed in pre-indictment negotiations was the crime of making a false statement. Calderon does not say what offense the government's June 2014 plea offer involved, but the December 2016 pretrial diversion offer and the June 2017 plea offer both involved Calderon pleading or admitting guilt to making a false statement. See § 2255 Motion at 6–9; see also Pet. Exs. 4, 5. But in the end, Calderon was acquitted of that charge and convicted of a different charge: theft of government property exceeding $1,000.00 in value. Thus, even if the Sixth Amendment right to counsel attached sometime before Calderon was indicted, it attached only to the charge of making a false statement—of which he was ultimately acquitted—and not the charge of theft of government property—of which he was convicted

and sentenced.[11]

In short, the Sixth Amendment right to counsel does not attach until the beginning of "adversary judicial criminal proceedings." McNeil, 501 U.S. at 175; Gouveia, 467 U.S. at 188. In Calderon's case, no adversarial judicial criminal proceedings had begun before he was indicted, so the Sixth Amendment right to counsel did not attach before then. Because Grounds One through Three center on the alleged failings of Calderon's attorneys in the months and years before the initiation of adversarial judicial criminal proceedings, they do not state a Sixth Amendment violation.[12] As a result, these claims do not warrant

---

[11]    If a defendant has been formally charged with a crime, the Sixth Amendment right to counsel "encompass[es] offenses that, even if not formally charged, would be considered the same offense under the … test" set out in Blockburger v. United States, 284 U.S. 299 (1932). Texas v. Cobb, 532 U.S. 162, 173 (2001). Even if Calderon could be considered to have been formally charged with making a false statement before he was indicted, the Sixth Amendment right to counsel would not have extended to the crime of theft of government property exceeding $1,000.00 in value. That is because the two offenses are distinct in that "each [statutory] provision requires proof of a fact which the other does not." Blockburger, 284 U.S. at 304; compare 18 U.S.C. § 641 (theft of government property exceeding $1,000.00) with 18 U.S.C. § 1001 (making a false statement).

[12]    As to Calderon's conflict-of-interest claim in Ground Two, he does not allege that inconsistent financial interests affected his counsel's performance post-indictment. See § 2255 Motion at 7–10, 23–26. (The Court also doubts that the fee agreement created an actual conflict of interest, but the Court has assumed so for simplicity's sake.) To establish a violation of the Sixth Amendment right to the effective assistance of counsel based on a conflict of interest, Calderon, who did not raise an objection at trial, "must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." Cuyler v. Sullivan, 446 U.S. 335, 348 (1980). Calderon identifies two ways that his attorneys' alleged inconsistent financial interests adversely affected their performance, both of which occurred before indictment: (1) by causing counsel not to communicate the government's June 2014 plea offer, and (2) by causing counsel not to fully advise him about the December 2016 pretrial diversion offer. Because Calderon does not identify how inconsistent financial interests adversely affected his counsel's performance post-indictment, Ground Two does not state a violation of the Sixth Amendment right to counsel any more than Grounds One and Three. (cont'd)

§ 2255 relief.

**B. Ground Four: Failing to cross-examine Dr. Bowden and Dr. Wong on certain topics**

Turning to Ground Four, Calderon alleges that Mr. Rosenblum gave ineffective assistance at trial by failing to cross-examine two of the government's medical provider witnesses—Dr. Bowden and Dr. Wong—about certain topics. § 2255 Motion at 13–15, 29–31. He alleges that there is a reasonable probability the outcome of the trial would have been different had counsel done so.

*1. Dr. Bowden's Testimony (Trial Tr. Vol. II at 116–33)*

Dr. Bowden, an ophthalmologist in Jacksonville, testified that Calderon was his patient for a time in the 1990's and for a period beginning in 2013. Trial Tr. Vol. II at 116–17. He testified about an exam he performed on Calderon on October 16, 2013 (when Calderon was asking the VA to reinstate his 100% disability rating). Id. at 118. Calderon reported that he had been diagnosed with granular corneal dystrophy, id. at 119, and that he could read only with a magnifier, was bothered by glare, would see "ghosts" or multiple images, and

---

Indeed, after Calderon was indicted, Mr. Rosenblum zealously fought the charges. He moved to dismiss the indictment (and partly succeeded in doing so), moved to suppress evidence (which was heavily litigated), took the case to a four-day jury trial (which resulted in an acquittal on one of the two charges), and secured a sentence of five years' probation with one year of home confinement (when the guidelines range was 33 to 41 months' imprisonment and the government was urging the Court to impose a prison term as part of the punishment, see Sentencing Tr. at 41–46).

had difficulty "making individual faces" or distinguishing males from females at a distance, id. at 120–21. Based on objective and subjective tests, Dr. Bowden determined that Calderon could count fingers from one foot away, which is worse than 20/800 vision. See id. at 121–24. Objective testing consisted of looking into Calderon's eyes and checking for opacities on the corneas (a telltale sign of granular corneal dystrophy), as well as inspecting the optic nerve and checking for signs of a retinal disorder. Id. at 119–20, 121–22. But, Dr. Bowden testified, because objective testing alone cannot determine how well a person can see, he performed subjective tests as well, which depend on the patient to provide truthful feedback about whether he can perceive certain stimuli. See id. at 120, 122–23. Dr. Bowden testified that he relied on the information Calderon provided during subjective testing. Id. at 123, 124. Calderon did not tell Dr. Bowden that he drove, worked on his car and boat, or went on mission trips to work on construction projects. Id. at 127.

Dr. Bowden testified that he discussed three surgical options with Calderon: a corneal transplant, PTK laser surgery (to remove or lessen corneal deposits), and a surgery to repair dry eyelids, and that he recommended the PTK procedure and dry eyelid procedure. Id. at 125–26. Dr. Bowden recalled that Calderon consented to the dry eyelid procedure, which was not covered by his health insurance, and he led Dr. Bowden to believe he would obtain coverage for the PTK procedure from the VA. Id. at 126. Calderon never obtained the

PTK procedure as far as Dr. Bowden knew. Id. Dr. Bowden said he thought it was unusual to have a patient "with significant visual impairment who's not anxious to embrace procedures, technologies, appliances that can help them see better." Id. at 129.

On cross-examination, Mr. Rosenblum responded to Dr. Bowden's suggestion that it was strange for Calderon not to pursue other treatments. Mr. Rosenblum pointed out that Calderon had undergone the PTK procedure in the 1990's, that his eye condition returned anyway, and that Calderon simply might not have wanted to undergo the surgery a second time. Id. at 129–30. Dr. Bowden stated that the PTK procedure can be repeated, and he thought it wise for Calderon to do so. Id. at 130–32. Mr. Rosenblum responded by eliciting testimony that the PTK procedure is only a temporary fix. Id.

Calderon claims Mr. Rosenblum gave ineffective assistance by failing to cross-examine Dr. Bowden about the severity of Calderon's granular corneal dystrophy, the tests he administered, Calderon's reasons for not undergoing additional procedures, and the difference between legal blindness and functional blindness. § 2255 Motion at 13–14, 29–31. He alleges that counsel's failure to do so left the jury with the impression that Calderon was faking his vision problems.

The record belies these claims. It was reasonable for Mr. Rosenblum not to rely on Dr. Bowden for evidence of the purported severity of Calderon's

condition because the defense presented its own optometrist, Dr. Danielle Vance Taylor. See Trial Tr. Vol. IV at 66–80. Dr. Taylor testified that Calderon had "advanced" granular corneal dystrophy based on the amount of opacity she observed when she examined his eyes. Id. at 72. Besides, Dr. Bowden described on direct examination how he assessed Calderon's vision. As for objective testing, Dr. Bowden said he checked Calderon's eyes for "corneal changes … consistent with [Calderon's] level of vision and to make sure there was no optic nerve or retinal disorder that might alternatively explain vision." Trial Tr. Vol. II at 122. Dr. Bowden testified that he conducted subjective testing as well because objective testing alone cannot determine how well a person can see. Id. at 120, 122. Calderon self-reported various vision-related symptoms (such as difficulty making out faces), id. at 120–21, and Dr. Bowden determined that Calderon could count fingers at one foot away, which suggested his vision was worse than 20/800, id. at 123–24. Even if Dr. Bowden administered other tests, he explicitly said he relied on the information Calderon provided him and assumed Calderon was providing truthful feedback. Id. at 123, 124. Had Mr. Rosenblum further pressed Dr. Bowden about how he assessed Calderon's condition, it would have risked highlighting how Calderon provided Dr. Bowden with incomplete or inaccurate information. The Court cannot say that counsel's decision not to press Dr. Bowden about his testing was "outside the wide range of professionally competent assistance." Chandler v. United States, 218 F.3d

1305, 1314 (11th Cir. 2000) (en banc) (internal quotation marks and citation omitted). Moreover, as the government points out, Calderon "does not explain in detail what specific questions should have been asked or what Dr. Bowden's answers would have been. Without proving how Bowden's unspecified answers to unspecified questions would have helped the petitioner, he has no claim." Response at 21 (internal citation omitted); see also Tejada, 941 F.2d at 1559 (vague and conclusory allegations do not support granting habeas relief). Likewise, Calderon fails to explain why it would have been relevant for Mr. Rosenblum to ask Dr. Bowden about the distinction between "functional blindness" and "legal blindness," since neither term is relevant to assessing a veteran's disability rating. See Gov't Ex. 4A at 4–5.

Calderon asserts that Mr. Rosenblum was ineffective for failing to push back on Dr. Bowden's opinion that it was strange for Calderon not to embrace a second PTK procedure or other treatments, leaving the jury with the impression that Calderon's condition must not have been so bad. § 2255 Motion at 31. The record does not support this claim. On cross-examination, Mr. Rosenblum pointed out that Calderon had undergone the PTK procedure in the 1990's, but his eye condition returned anyway. Trial Tr. Vol. II at 129–30. Mr. Rosenblum implied that perhaps Calderon simply did not want to undergo the procedure again, especially since it would only be a temporary fix. Id. at 130–32. Calderon asserts that Mr. Rosenblum should have reinforced the point by

highlighting the risks of the PTK procedure (like infection or hemorrhaging). § 2255 Motion at 29. But Mr. Rosenblum got his basic point across that Calderon could have had valid reasons not to undergo the PTK surgery a second time.

Calderon also alleges that Mr. Rosenblum was ineffective for not confronting Dr. Bowden with his own records, which reflected that Calderon told Dr. Bowden his health insurance would not cover a second PTK procedure. Id. at 29. That may have been true, but it would not have helped Calderon. Dr. Bowden testified that Calderon led him to believe he was seeking VA funds for the PTK procedure, Trial Tr. Vol. II at 126, but VA records showed that Calderon never requested funding for the surgery, Trial Tr. Vol. III at 126–27. Mr. Rosenblum's revisiting this topic on cross-examination "would have been a disastrous line of questioning" because it "would have only emphasized [Calderon's] false statement[s] to his own doctor." Response at 21.

Calderon also asserts that Mr. Rosenblum was ineffective for not asking Dr. Bowden about the administration of an OKN drum test. § 2255 Motion at 14, 30. But Calderon points to no evidence that Dr. Bowden administered an OKN drum test to Calderon or that he could have offered favorable testimony if asked about it. Thus, Calderon fails to overcome the "strong presumption" that Mr. Rosenblum made reasonable professional judgments in cross-examining Dr. Bowden. See Chandler, 218 F.3d at 1314.

In all events, Calderon fails to show how he was prejudiced by his attorney's failure to follow up with Dr. Bowden about certain topics. Dr. Bowden's testimony was only a small piece of the government's case. The government amassed years of evidence showing that, while Calderon was claiming to be so visually impaired as to deserve a 100% disability rating, he was driving a truck without incident, obtaining driver's licenses in Florida and Puerto Rico, traveling abroad for mission trips, and doing countless other tasks inconsistent with a total vision impairment. On one occasion, Calderon told investigators that God had healed him, that doctors were wrong when they told him he was blind, and he pointed out a pen tucked into an investigator's shirt pocket from five or six feet away. Trial Tr. Vol. I at 184–85. On another occasion, Calderon admitted to investigators that he knew in 2008 when he obtained his Florida driver's license that he was receiving more VA benefits than he was entitled to. Trial Tr. Vol. II at 62–63. In 2013 alone, Calderon claimed in an April VA exam that he should not be driving and performed in a way that suggested his vision was worse than 20/400, id. at 71–72, 150, then two months later he obtained a driver's license in Puerto Rico by submitting documentation that his vision was 20/50, Gov't Ex. 9A at 2, and then a month after that he returned to a VA clinic and performed in a way that his vision was worse than 20/14,000, Trial Tr. Vol. IV at 28–29. And it was evident that it was the VA— not DHSMV authorities—that Calderon was deceiving. Calderon had not had

any traffic accidents or infractions in Puerto Rico or the Florida counties where he lived since 2000, Trial Tr. Vol. III at 125–26, 155, and he went about various daily tasks without difficulty. Indeed, it was this type of evidence that the government emphasized in closing argument and rebuttal, not Dr. Bowden's testimony. Trial Tr. Vol. IV at 127–47, 169–74. Given the abundant evidence against Calderon, there is not a reasonable probability the jury would have acquitted him but for Mr. Rosenblum's failure to cross-examine Dr. Bowden about certain topics. See Strickland, 466 U.S. at 694.

### 2. Dr. Wong's Testimony (Trial Tr. Vol. II at 167–86)

Dr. Arthur Wong was the VA optometrist who performed the C&P exam on Calderon in April 2013. Trial Tr. Vol. II at 167–68. The VA asked Dr. Wong to record the exam, which he did. Id. at 169–71. When Dr. Wong asked about driving, Calderon said his wife drove, which Dr. Wong understood to mean that Calderon did not drive. Id. at 174–75. Dr. Wong testified that he saw evidence of granular corneal dystrophy in Calderon's eyes, id. at 172–73, and administered an OKN drum test, id. at 175–76. He described an OKN drum as a device used to check vision "when somebody's vision is very poor, meaning it's either light perception, hand motion, or count[ing] fingers." Id. at 175. Dr. Wong explained that if the OKN drum test elicits a positive response in the eye, it means the person's vision is "at least 20/400." Id. Dr. Wong testified that the OKN drum test elicited a response from Calderon. Id. at 176. A video of the

OKN drum test was also played for the jury. See id. Dr. Wong testified that he relies on information provided by the patient when assessing their visual acuity, and that inaccurate information could skew the results. Id. at 176–77.

On cross-examination, Dr. Wong testified that based on the OKN drum test, he marked down Calderon's vision in the right eye as at least 20/400. Id. at 179–80. Dr. Wong did not mark down Calderon's vision in the left eye because it was worse than 20/400. Id. at 180. Dr. Wong explained he has no way to quantify vision if it is worse than 20/400, id. at 181, and that he determined that Calderon's vision in the left eye consisted of the ability to perceive hand motion or count fingers at three feet, id. at 180. He did not explicitly say if he administered the OKN drum test on Calderon's left eye. On redirect, Dr. Wong testified that he determined Calderon's visual acuity in his left eye based on information Calderon provided. Id. at 184–85.

Calderon alleges that his attorney gave ineffective assistance by failing to ask Dr. Wong if he administered the OKN drum test to the left eye, and if so, whether Calderon had a response to it. § 2255 Motion at 14–15. But Calderon does not specify what Dr. Wong's answer would have been to this question; he merely assumes that something helpful would have come from it, though there is no basis for that assumption. "This kind of speculation is 'insufficient to carry the burden of a habeas corpus petitioner.'" Johnson v. Alabama, 256 F.3d 1156, 1187 (11th Cir. 2001) (quoting Aldrich v. Wainwright, 777 F.2d 630, 636 (11th

Cir. 1985)). Besides, Dr. Wong testified that he relied on information Calderon provided in assessing his vision in the left eye. Since Dr. Wong testified that Calderon's vision in his left eye was <u>worse</u> than 20/400, it was reasonable for defense counsel to leave it at that without probing further. <u>See</u> <u>Chandler</u>, 218 F.3d at 1315 ("[B]ecause counsel's conduct is presumed reasonable, … a petitioner must establish that no competent counsel would have taken the action that his counsel did take.").

Even if counsel should have probed whether Dr. Wong administered the OKN drum test to Calderon's left eye, Calderon has not shown prejudice. Dr. Wong answered only a handful of questions about the OKN drum test, and the results of that test were never mentioned in the government's closing argument or rebuttal argument. Trial Tr. Vol. IV at 127–47, 169–74. Dr. Wong—like Dr. Bowden and Dr. Taylor—testified that truthful information from the patient is necessary to accurately determine a person's visual acuity, and Dr. Wong testified that he relied on information provided by Calderon in assessing his vision. The government had amassed years of evidence showing that Calderon did not have the degree of visual impairment he claimed to have in VA disability applications, including Calderon's own admissions to investigators. Thus, Calderon fails to show a reasonable probability that the trial's outcome would have been different but for counsel's failure to ask Dr. Wong about whether he administered the OKN drum test to his left eye. <u>See</u> <u>Strickland</u>, 466 U.S. at 694.

### C. Cumulative Prejudice

Finally, Calderon alleges that the cumulative effect of his attorneys' errors deprived him of a fair trial and entitles him to relief. § 2255 Motion at 31–32. "While the prejudice inquiry should be a cumulative one as to the effect of all of the failures of counsel that meet the performance deficiency requirement, only the effect of counsel's actions or inactions that do meet that deficiency requirement are considered in determining prejudice." Evans v. Sec'y, Fla. Dep't of Corr., 699 F.3d 1249, 1269 (11th Cir. 2012). Because the Sixth Amendment right to counsel had not attached at the times relevant to Grounds One through Three, they do not factor into a cumulative error analysis. As to Ground Four, the Court finds no deficiency in counsel's performance, so there are no deficiencies to accumulate. See United States v. Gamory, 635 F.3d 480, 497 (11th Cir. 2011) ("Where there is no error or only a single error, there can be no cumulative error."). Alternatively, given the substantial evidence the government had amassed against Calderon over the years, Calderon has not shown cumulative error.

### IV.   Conclusion

The Court expresses no opinion about the propriety of defense counsel's actions or advice before Calderon was indicted. As to Grounds One through Three, the Court finds only that the Sixth Amendment right to counsel had not attached, and therefore these grounds do not provide a basis for relief under 28

U.S.C. § 2255. Having reviewed each of Calderon's claims and finding that none warrants habeas relief, it is **ORDERED:**

1. Petitioner Jose Calderon-Fuentes's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence (Civ. Doc. 1) is **DENIED**.

2. The Clerk will enter judgment for the United States and against Calderon, and close the file.

3. If Calderon appeals the denial of the petition, the Court denies a certificate of appealability (COA).[13] Because this Court has determined that a COA is not warranted, the Clerk will terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed. Such termination will serve as a denial of the motion.

**DONE AND ORDERED** at Jacksonville, Florida this 1st day of December, 2022.

_____
BRIAN J. DAVIS
United States District Judge

---

[13]     This Court should issue a COA only if a petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further,'" Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)). Upon due consideration, this Court finds that a COA is not warranted.

lc 19
Copies:
Counsel of record
Petitioner